UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KRISTOPHER T. SAUNDERS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:13-cv-00244-JDL |
| | ) | |
| GETCHELL AGENCY INC., et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION**

In this action, Plaintiffs Cory Scribner, Jared Forrest, Katelin Varney, Taylor Perkins, and Karey Ann Sinclair, allege that Defendants Getchell Agency Inc. and Rena Getchell violated the overtime pay requirements of the Fair Labor Standards Act and the Maine minimum wage and overtime laws. [1]

On February 12, 2014, the Court granted Plaintiffs' Motion to Conditionally Certify a FLSA Collective Action and approved a form of notice to be sent to potential plaintiffs.  The matter is before the Court on Plaintiffs' Motion to File Opt-In Consent Forms (ECF No. 75), Plaintiffs' Motion for Certification of Class Action under Rule 23 (ECF No. 82), and Defendants' Motion to Decertify Conditionally Certified Collective Action (ECF No. 81). [2]

Following a review of the pleadings, and after consideration of the parties' arguments, as explained below, the recommendation is that the Court grant Plaintiffs' Motion for Certification, deny Defendants' Motion to Decertify, and grant Plaintiffs' Motion to File Opt-In Consent Forms.

---

[1] Kristopher Saunders, whose name appears in the caption, was terminated as a plaintiff on February 11, 2014.  (ECF No. 51.)

[2] The Court referred the motions for report and recommended decision.

**Nature of the Case**

Plaintiffs are former employees of Defendant Getchell Agency, a Maine corporation that provides housing and services to dependent adults ("consumers").  Each Plaintiff was employed as a "House Manager," and worked multi-day, consecutive, 24-hour, "live-in" shifts.  Typically, the shifts were assigned for seven consecutive days from a Wednesday to a Wednesday.  The work hours, therefore, were divided over a two week period for purposes of computing overtime.  House Managers were to be paid for 16 hours per day, with an 8-hour period classified by policy as unpaid sleep time.  Upon completion of a seven-day shift, House Managers did not work until the following Wednesday.

Both the Fair Labor Standards Act, 29 U.S.C. § 207 (FLSA), and the Maine minimum wage and overtime law, 26 M.R.S. § 664, require overtime pay for the time worked in excess of forty hours per week.  Under the FLSA, Plaintiffs can pursue wage claims on their own behalf and on behalf of others similarly situated in a collective action.   29 U.S.C. § 216(b).  Because a collective action is not available on Plaintiffs' supplemental state law wage claim, Plaintiffs seek to pursue the state claim as a class action pursuant to Federal Rule of Civil Procedure 23.

Plaintiffs define the individuals in the collective action and the proposed class to include all House Managers who were required to be with consumers 24 hours per day who were not paid for all overtime hours.[3]  (Second Amended Complaint ¶¶ 33, 44.)  Plaintiffs assert that the bases for their claims for unpaid wages are (1) that Defendants never entered into proper agreements with them to exclude the sleep-time hours; (2) that Defendants refused to pay for overnight hours even when Plaintiffs were awake and attending to the needs of the consumers; and (3) that Plaintiffs' sleeping arrangements were insufficiently private to permit Defendants to exclude the

---

[3] There is no contention that Plaintiffs were not paid any overtime, only that they were not uniformly paid overtime for their "sleep time" hours.

sleep hours when computing Plaintiffs' wages.  (*See*, *e.g.*, Plaintiffs' Motion for Certification of Class Action at 4-8.)

Following the conditional certification of the FLSA collective action and the issuance of court-approved notice to prospective members, approximately 100 individuals opted-in to the action.  (*Id.* at 9.)

The conditionally certified FLSA collective is defined as follows:

> House Managers who were paid on an hourly basis sometime during three years prior to the Complaint and who were required to be with consumers twenty-four (24) hours per day.

The three-year period is based on the three-year statute of limitation applicable to "willful" violations of the FLSA.  29 U.S.C. § 255(a).

The proposed class for the state law claim is defined as follows:

> All persons who were, are, or will be employed by Defendant as House Managers in the State of Maine and who were paid on an hourly basis during the six years prior to the filing of the complaint in this case, and who were required to be with the consumers for 24 hours per day.

The six-year period is based on Maine's general six-year statute of limitation.  14 M.R.S. § 752.

## DISCUSSION

### A.    Defendants' Motion to Decertify Conditionally Certified Collective Action

"Like a class action under Federal Rule of Civil Procedure 23, a collective action under 29 U.S.C. § 216(b) gives 'plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources' and allows for 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity.'"  *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 359 (D. Me. 2010) (quoting *Hoffmann–La Roche v. Sperling,* 493 U.S. 165, 170 (1989)).  Unlike a class action, potential plaintiffs must "opt in" to be included in the action and certification of a collective action proceeds in two-stages.  *Id.*

At the first stage of the certification process, the Court determined that Plaintiffs made the requisite "modest factual showing" that they and the prospective plaintiffs suffered from "a common unlawful plan." (Order on Motion for Conditional Certification at 13, ECF No. 52, quoting *Johnson v. VCG Holding Corp.*, 802 F. Supp. 2d 227, 234 (D. Me. 2011).) Following a period of discovery, Defendants move to decertify the class. Defendants contend that a collective action is not appropriate because the liability issue requires individualized inquiries and thus the case cannot be resolved through the presentation of representative evidence.

The Court must now determine, with the benefit of discovery, whether Plaintiffs and the prospective plaintiffs who have opted-in to the action are in fact similarly situated. *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364 (D. Me. 2010); *see also Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013); *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 583 (6th Cir. 2009).[4] The second-stage inquiry is governed by a stricter standard than the modest standard applied at the first stage. *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546-47 (6th Cir. 2006). Plaintiffs must demonstrate that they are similarly situated to the other members of the conditionally certified action, and they must produce "'more than just allegations and affidavits' demonstrating similarity in order to achieve final certification." *Frye v. Baptist Mem'l Hosp., Inc.*, 495 Fed. App'x 669, 671 (6th Cir. 2012) (quoting *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1261 (11th Cir. 2008)).

The "overriding question" is whether the original plaintiffs and the opt-in plaintiffs are "similarly situated." *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102 (10th Cir. 2001). In order to serve the interest of judicial economy and prevent abuse, the similarity among plaintiffs

---

[4] The Court of Appeals for the First Circuit recently reviewed an order dismissing a collective action. *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34 (1st Cir. 2013). However, the First Circuit has not specifically articulated the requirements for final certification.

to a collective action must relate to more than just "job duties and pay provisions". *Morgan*, 551 F.3d at 1262; *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002).

The three factors that are typically used to assess the similarity of potential plaintiffs in a collective action are: the plaintiffs' employment settings, the individual defenses available to the defendant that may require individualized proof, and fairness and procedural considerations. *Id.*; *Morgan*, 551 F.3d at 1261. Although these three factors are commonly considered, certification involves an ad hoc consideration of all relevant factors, made on a case-by-case basis. *Mott v. Driveline Retail Merch., Inc.*, No. 2:12-cv-05244, 2014 WL 2115469, at *3 (E.D. Pa. May 21, 2014).

If the Court concludes that Plaintiffs are similarly situated, the action proceeds collectively; otherwise, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative[s] may proceed on [their] own claims." *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006).

### 1.     *Federal law governing payment of on-call, sleep-time hours*

The record is undisputed that House Managers are potentially "on-call" during overnight hours. Whether "on-call" time is compensable time under the FLSA is a factual inquiry. An on-call employee is either "engaged to wait" and entitled to compensation; or "wait[ing] to be engaged" and not entitled to pay. *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944). *See also Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 935 (9th Cir. 2004). [5] To determine which situation exists, courts must "scrutin[ize] and constru[e] the agreements between the particular

---

[5] "'[E]xertion' [is] not in fact necessary for an activity to constitute 'work' under the FLSA." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (*citing Armour & Co. v. Wantock,* 323 U.S. 126, 133 (1944)). "[A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." *Armour & Co.*, 323 U.S. at 133. "Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." *Id.*

parties, apprais[e] their practical construction of the working agreement by conduct, consider [ ] the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Skidmore,* 323 U.S. at 137.[6]  The existence of an agreement between the parties may be implied by conduct.  *Brigham*, 357 F.3d at 938; *Braziel v. Tobosa Dev. Servs.*, 166 F.3d 1061, 1063 (10th Cir. 1999); *Ariens v. Olin Mathieson Chem. Corp.,* 382 F.2d 192, 197 (6th Cir. 1967).

To aid in the analysis, the Department of Labor has promulgated regulations to address certain situations, including situations in which an employee is required to work in excess of 24 hours of continuous duty, 29 C.F.R. § 785.22, and in which the employee is required to reside on the employer's premises, 29 C.F.R. § 785.23.

Pursuant to the 24-hour duty regulation:

(a) General.  Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.  If sleeping period is of more than 8 hours, only 8 hours will be credited.  Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

(b) Interruptions of sleep.  If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked.  If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22 (citations omitted).  In accordance with the regulation, an employer can exclude an 8-hour period for sleep if (1) there is an express or implied agreement to exclude those hours;

---

[6] In the Ninth Circuit, the two most important factors to consider have been determined to be "(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties."  *Brigham*, 357 F.3d at 936 (quoting *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992), *as amended* (Aug. 18, 1992)).

(2) the sleeping facilities are "adequate" and the employee "usually" can sleep uninterrupted; and

(3) when interruptions occur, appropriate compensation is paid. *Id.*

The regulation that addresses an employee who resides on the employer's property for an extended period of time provides:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home.

29 C.F.R. § 785.23. According to the regulation, under certain circumstances, an employer is not required to pay for all of the time that a worker is on its property. "[A]ny reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted." *Id.* The Department of Labor regulations thus suggest that depending on the circumstances, Defendants might not be obligated to compensate Plaintiffs and prospective members of the collective action for the sleep period.

### 2. *The collective action factors*

Plaintiffs argue that the members of the proposed class are similarly-situated because they all worked as House Managers, performed seven-day shifts during which they tended to the needs of adults with developmental disabilities, and were subject to a uniform policy denying payment for eight hours of sleep time. They describe the "central legal question" as "whether the policy, or agreement, regarding overnight pay was 'reasonable' as a matter of law." (Plaintiffs' Opposition to Motion to Decertify at 1-2 ("Plaintiffs' Opposition"), ECF No. 88.) Plaintiffs

maintain that the issue will be resolved based on common evidence that will demonstrate that the general agreement was not reasonable because Defendants were not required to pay Plaintiffs for hours actually worked during the sleep time period, or alternatively, because "sleeping accommodations were not 'private.'"  (*Id.* at 3.)

Defendants request decertification because, in their view, each material issue requires an individualized assessment.  They contend that as to each potential plaintiff the circumstances vary.  That is, according to Defendants, while a uniform policy applied to each member of the proposed class, the terms of the agreement differed among the House Managers.  For instance, some potential plaintiffs received compensation for hours worked within the sleep period, and the sleeping conditions were different in some of the locations.  (Defendants' Motion to Decertify at 7-21 ("Defendants' Motion"), ECF No. 81.)

> a.    *Employment settings*

An assessment of the "employment setting" includes consideration of the potential plaintiffs' job duties, location, supervision, salary, and policies or practices applied to the group as a whole.  *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012); *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011).  Here, the job duties, geographic location, and supervision are similar.  In addition, all of the members of the group were subject to the Getchell Agency Employee Handbook, which states in pertinent part:

> House Managers provide direct care service and support to our consumers who have mental retardation, physical disabilities and mental health issues.  The House Managers are expected to provide the individualized care and support that each consumer requires, up to and including total physical care.
>
> The work schedule is seven consecutive days on and seven consecutive days off on a rotating schedule.  The work week goes from 12:00 noon on Wednesday until 12:00 noon the following Wednesday.  Occasionally, we offer different shifts depending on the needs of the consumer but most shifts offered are 7 day live-in.

> Staff is paid for a 16 hour day with 8 hours to sleep.  At night, after all home needs
> are completed, and the consumers are in bed, the staff is able to sleep until 5:00 am
> the next morning unless a consumer need[s] assistance or support during the night.

(ECF No. 82-4.)  Plaintiffs and the potential plaintiffs, therefore, are subject to the same policy regarding their entitlement to compensation during the overnight hours.

While the House Managers are similarly-situated on a number of the "employment setting" factors, the record evidence suggests that they differ in some respects.  For example, some of the House Managers assert that they were paid for time during the overnight period when they were tending to a consumer, and others report that they requested, but did not receive, pay for such time. The number of individuals in each group is unclear.

In addition, the record reflects some modest variation in the locations at which the House Managers worked.  Defendants used as many as 44 homes to provide services to consumers.[7]  With the exception of two homes, all of the homes are mobile homes.  Most of the homes are located in the same neighborhood in Bangor.  Defendant Getchell Agency owns or leases all of the homes and consumers may stay in the homes provided that they receive services from the Getchell Agency.  Most of the homes have three bedrooms, while some have two bedrooms.  Two consumers reside in some of the homes, and other homes accommodate only one consumer. (Plaintiffs' Opposition at 9-10.)  When one bedroom is available for two House Managers who are assigned to 24-hour shifts in the same home, the House Managers are required to sleep in close proximity to each other (ECF No. 88-7).[8]  Because of the limited space, and because House Managers of the opposite sex were at times assigned to the same home, on occasion, a House

---

[7] *Compare* Declaration of Rena Getchell, ECF No. 41-1, ¶ 3 (44 homes) *with* Deposition of Shawn Getchell, ECF No. 82-11, at 22 (30 to 33 mobile homes in a park plus two houses at another location) *and* Deposition of Susan Jackson, ECF No. 82-1, at 14 (34 homes).

[8] "About 12 of the homes are double staffed.  Of those, several also have an awake overnight staff member." (Declaration of Rena Getchell ¶ 4, ECF No. 41-1.)

Manager chose to sleep on a couch in a common area. [9]  Not uncommonly, House Managers worked in more than one location and thus experienced different sleeping conditions during different weeks.  (*See* Defendant's Motion at 11-14, 19.)

Defendants insist that given this variety, a collective action would not be efficient.  In other words, Defendants contend that an exploration of each House Manager's experience would be necessary on both the liability and damages issues.  Although the proposed class members' might have experienced some different conditions, their various experiences do not compel decertification.  First, on the liability issue, the central issue is whether Defendants had a reasonable agreement with Plaintiffs and the potential plaintiffs regarding the House Managers' entitlement to compensation during the sleep period.  Insofar as the same written policy regarding the sleep period applied to all of the House Managers, at a basic level (i.e., does the policy constitute a reasonable agreement), the evidence on the principal liability issue will be similar among the members of the proposed class.

Additionally, many, if not most, of the differences among members of the proposed class are relevant to the damages issues.  The fact that more individualized evidence on damages might be necessary does not require decertification.  *Butler v. DirectSat USA, LLC*, No. 8:10-cv-02747, 2014 WL 4684337, at *7 (D. Md. Sept. 18, 2014); *LaFleur v. Dollar Tree Stores, Inc.*, No. 2:12-cv-00363, 2014 WL 934379, at *10 (E.D. Va. Mar. 7, 2014), *reconsideration denied,* 2014 WL 2121563 (E.D. Va. May 20, 2014); *Thompson v. Bruister & Associates, Inc.*, 967 F. Supp. 2d 1204, 1215 (M.D. Tenn. 2013); *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 381 (W.D. Pa. 2011); *Metcalfe v. Revention, Inc.*, No. 4:10-cv-03515, 2012 WL 3930319, at *6 (S.D. Tex. Sept. 10,

---

[9] Some of the opt-in plaintiffs signed forms stating that they "feel comfortable" sharing a room and "will be able to receive adequate rest for 8 hours" under such circumstances.  (See ECF Nos. 81-4, 81-5.)  Plaintiffs argue that such an agreement is invalid as a matter of law.  (Plaintiffs' Opposition at 22 n.12.)

10

2012) (unreported).  When necessary to address differences among class members, courts can invoke various case management techniques, including the bifurcation of the liability and damages issues, and the establishment subclasses for damages.  *Butler*, 2014 WL 4684337, at *10; *Thompson*, 967 F. Supp. 2d at 1222; *cf.* Fed. R. Civ. P. 23(c), (d).  Courts can also revisit certification decisions if the management techniques employed do not prove effective.  *Espenscheid v. DirectSat USA*, LLC, No. 3:09-cv-00625, 2011 WL 2009967, at *2 (W.D. Wis. May 23, 2011) *amended,* 2011 WL 2132975 (May 27, 2011) and *aff'd,* 705 F.3d 770 (7th Cir. 2013).

For example, if as the case proceeds the Court determines that the quality of the sleeping facilities will govern the liability issue, the Court could establish subclasses.  The record reflects only two basic sleep accommodations: a private bedroom or a shared bedroom with beds in close proximity. [10]  The existence of only two types of sleeping assignments suggests that even if this more individualized assessment is required, facilities could reasonably be managed through the use of subclasses.

### b.  *Individual defenses*

Defendants' argument regarding the existence of individualized defenses is inextricably linked to the question of whether the Plaintiffs and the potential plaintiffs are similarly situated. In Defendants' view, the issues relevant to the employment setting "will necessarily form the basis of individualized defenses to each plaintiff's claims."  (Defendants' Motion at 22.)  In essence, Defendants' arguments as to their individual defenses are the same arguments that Defendants' raised and that are addressed above in connection with in the employment setting issue.

---

[10] The fact that some House Managers elected to sleep on a couch in community space due to the size of the shared sleeping facilities is better understood to be representative evidence related to the quality of the shared sleeping facilities rather than evidence of a third sleeping facility.

Defendants otherwise argue that individualized defenses exist based on a "companionship exception" to the federal minimum wage and hour requirements.  (*Id.*)  The statutory exception upon which they rely provides:

> The provisions of section 206 . . . and section 207 of this title shall not apply with respect to . . . any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)[.]

29 U.S.C.A. § 213(a)(15).  Given the factors that govern the inquiry,[11] whether the exception applies is susceptible to resolution based on representative testimony.  Defendants' argument that this statutory exception requires an individualized assessment is not persuasive.

Defendants' more general contention that the need for individualized evidence compels decertification is also unconvincing.  The primary issue is whether the parties had a reasonable agreement regarding the eight-hour sleep period.  As to the formation of the agreement, one must assess the parties' "practical construction of the working agreement by conduct" and consider "all of the surrounding circumstances."  *Skidmore,* 323 U.S. at 137.  The evidence suggests that Plaintiffs may prove through representative evidence that Defendants maintained a common policy of denying pay for the sleep time period even though work was performed within the period.  The inquiry also involves "the nature of the service, and its relation to the waiting time," *id.*, which factors are generally similar among members of the class.  With the many material similarities

---

[11] The suggested factors are (1) who has management control of the unit and whether the unit is maintained primarily for the provision of assistive services; (2) who owns the living unit, or if not owned by the provider or client, who leases the unit; (3) who manages and maintains the residence, providing the essential things that the client needs to live there, such as paying the rent, utilities, providing clean linens and clothes, and providing food; (4) whether the client would be allowed to live in the unit if the client were not contracting with the provider for services; (5) the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit (including government subsidies); and (6) whether the service provider uses any part of the residence for the provider's own business purposes.  *Threatt v. CRF First Choice, Inc.*, No. 1:05-CV-00117, 2006 WL 2054372, at *7 (N.D. Ind. July 21, 2006).

among the class members, Defendants' potential particularized defenses to *some* of the claims of *some* of the proposed class members is insufficient to defeat the class.   To the extent that Defendants believe that they have defenses as to the claims of some of the class members, Defendants would not be precluded, merely because the Court permitted the collective action to proceed, from prosecuting the defenses.

c.    *Fairness and procedural considerations*

When weighing fairness and procedural considerations, a court must consider the primary objectives of a collective action, which objectives are to lower costs to the plaintiffs through the pooling of resources, to resolve efficiently common issues of law and fact, and to manage the class so as not to prejudice any party.  *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 10-CV-1341 PKC WDW, 2014 WL 2534833, at *9 (E.D.N.Y. June 5, 2014).   Defendants argue that a collective action would not achieve much efficiency because they would need to call over 100 witnesses, creating mini-trials and frustrating any determination based on representative evidence. (Defendants' Motion at 24-25.)   They also assert that there "is no workable framework to divide the various plaintiffs into subclasses based on the multiple factual variables."  (*Id.* at 25.)   Plaintiffs contend that fundamental fairness and the purpose of the FLSA would not be served if each House Manager had to pursue a separate action.   In their view, any difficulties in managing this class could be addressed through "bifurcation of liability and damages, the creation of subclasses, representative testimony, or other methods as the court deems appropriate."    (Plaintiffs' Opposition at 23, quoting *Andrako*, 788 F. Supp. 2d at 383-84.)

Here, the objectives of a collective action and the interests of judicial economy would be frustrated by decertification.   Decertification could result in nearly 100 separate trials involving many of the same witnesses, the same evidence and the same legal issues.   In addition, some

potential plaintiffs with meritorious claims might be deterred because of the litigation costs. Furthermore, the collective action would not be prejudicial to Defendants. As explained earlier, the Court can adopt a number of measures to allow Defendants to present evidence that might be particular to any of the individual Plaintiffs or potential plaintiffs.[12]

### d.   Summary

Plaintiffs and the opt-in plaintiffs held similar positions for the same company, with the same management, in a similar geographical location; were required to work multiple consecutive 24-hour shifts from which, pursuant to a common policy, an eight-hour sleep period was subject to exclusion for compensation purposes; and were assigned similarly configured sleeping facilities that were either private or shared. Although the record includes evidence of some differences among the experiences of some of the class members, Plaintiffs have demonstrated sufficient similarity among class members to justify a collective action.

### B.   Plaintiffs' Motion to Certify a Class Action

In addition to their claims under the FLSA, Plaintiffs assert claims under Maine's minimum wage and overtime law, and seek class certification for the state law claims. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, a party requesting class certification must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

---

[12] In addition to the previously-discussed case management techniques, the Court can also reexamine the appropriateness of the collective action as the case proceeds and perhaps more clarity about the evidence and issues develops.

Fed. R. Civ. P. 23(a).  If these conditions are met, the Court may certify an action if the action is of a type identified in section (b) of the Rule.[13]  Fed. R. Civ. P. 23(b).

Rule 23 imposes more than "a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011).  The movant must "be prepared to prove" that each of the Rule 23(a) requirements is met "in fact," *id.*, and "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  A court must conduct a "rigorous analysis" of that showing.  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  In some cases, this analysis will require a court to consider questions that "overlap with the merits of the plaintiff's underlying claim."  *Dukes*, 131 S. Ct. at 2551.  "When legal and factual premises of a case are disputed, such that 'the class action would be proper on one premise but not another,' a district court 'has the power to test disputed premises at the certification stage' by probing 'behind the pleadings to formulate some prediction as to how

---

[13] Pursuant to Rule 23(b):

    A class action may be maintained if Rule 23(a) is satisfied and if:

    **(1)** prosecuting separate actions by or against individual class members would create a risk of:

      **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

      **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

    **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

    **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

      **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

      **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

      **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

      **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23

specific issues will play out.'" *Van Meter v. Harvey*, 272 F.R.D. 274, 280 (D. Me. 2011) (quoting *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 522 F.3d 6, 17 (1st Cir. 2008) (internal punctuation and citations omitted)).  While a critical assessment is required, a court should avoid permitting the certification motion process to become "an *unwieldy* trial on the merits."  *Id.* (quoting *In re PolyMedica Corp. Sec. Litig.,* 432 F.3d 1, 17 (1st Cir. 2005) (emphasis in original)).

### 1.    *State law governing payment of on-call, sleep-time hours*

Plaintiffs' state law claims for unpaid wages arise under Maine's minimum wage and overtime law, 26 M.R.S. §§ 664, 670.[14]  Plaintiffs allege that Defendant Getchell Agency did not compensate them for all of the time that they worked.  More specifically, Plaintiffs maintain that Defendants improperly excluded from Plaintiffs' work time the eight-hour sleep period.

Whether one engaged in "work" for purposes of Maine law is determined based on "the totality of circumstances in a given case" and presents "a uniquely factual determination."  *Crook v. Russell*, 532 A.2d 1351, 1355 (Me. 1987).  Thus, "[w]hether waiting time is compensable for purposes of overtime pay is a question resolved by assessing the totality of the circumstances in a given case."  *Id.* at 1354 (citing *Skidmore*, 323 U.S. at 137).  Of particular relevance "is whether time spent on-call is primarily for the benefit of the employer or for the benefit of the employee."  *Id.* (affirming judgment for defendant employer where plaintiff was an on-call EMT free to leave defendant's premises provided he supplied a contact number or carried a pager, remained reasonably available to respond to an emergency, refrained from the use of alcohol, and responded in the company uniform, and where no other duty was imposed during the overnight shift).  The "agreements between the particular parties" is also a relevant consideration.  *Gould v. A-1 Auto,*

---

[14] The claims are actionable only against Defendant Getchell Agency, not against Defendant Rena Getchell, as this Court previously ruled on Defendants' Motion to Dismiss.  (February 11, 2014, Order on Motion to Dismiss, ECF No. 51.)

*Inc.*, 2008 ME 65, 945 A.2d 1225, 1229 n.5 (citing *Skidmore*, 323 U.S. at 136-137).   Where definitional issues arise under the Maine minimum wage and overtime law, the Maine Supreme Judicial Court "may look to analogous federal statutes, regulations, and case law for guidance." *Gordon v. Maine Cent. R.R.*, 657 A.2d 785, 786 (Me. 1995).[15]   For this reason, application of Maine law in this case may not involve a different analysis than federal law requirements.

### 2.   The Rule 23 standards

#### a.   Numerosity

The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).   The Court "may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health & Human Servs.,* 817 F.2d 161, 167 (1st Cir. 1987).

Defendants again cite to the potential differences among the proposed class members in an effort to persuade the Court that Plaintiffs do not satisfy the numerosity requirement.   Defendants' argument is unavailing.   Plaintiffs have identified approximately 100 potential claimants who worked the 24 hour shifts as House Managers under the compensation policy articulated in Defendants' Employee Handbook, in similar geographic locations, with similar, if not identical job responsibilities.   Under the circumstances, Plaintiffs have satisfied the numerosity requirement.

---

[15] Defendants argue that this Court should decline supplemental jurisdiction based on the idea that novel issues of state law predominate in the case, citing 28 U.S.C. § 1367.  (Defendants' Opposition to Motion for Class Certification at 10-12, ECF No. 89.)  When determining unsettled issues of state law, however, "a federal court sitting in diversity should not simply throw up its hands but, rather, should endeavor to predict how that court would likely decide the question."  *Butler v. Balolia*, 736 F.3d 609, 613 (1st Cir. 2013).  One likely assessment is that the Maine Supreme Judicial Court would hold that Maine minimum wage and overtime law should be consistent with the FLSA where a contrary legislative intent is not apparent in Maine statutes or regulations.  For this reason, it is not recommended that the Court decline to exercise supplemental jurisdiction.

b. *Commonality*

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The First Circuit has described this requirement as a "low bar." *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 522 F.3d 6, 19 (1st Cir. 2008). In this case, Plaintiffs have satisfied that "low bar."

The preliminary legal issue - whether under Maine law, Plaintiffs are deemed to have worked during the eight-hour sleep period given their on-call assignments – is common to all of the proposed class members. Even if the entire eight-hour period cannot be deemed compensable time, common questions remain such as whether, and, if so, under what conditions, Defendants can lawfully exclude the eight-hour sleep period when computing Plaintiffs' compensation. In addition, the facts that are likely relevant to these determinations (*e.g.*, Defendants' policy, Defendants' expectations of the House Managers during the eight-hour sleep period, the work performed by House Mangers) are common to the class.[16]

c. *Typicality*

Typicality requires that the claims of the representative parties are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The typicality analysis is designed to ensure that class representatives, in pursuing their own interests, concurrently will advance those of the class." *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 27 (D. Me. 2013). As discussed in detail herein, the experiences of the proposed class members are sufficiently similar to satisfy this requirement.

---

[16] Some of the other factual issues that Defendants cite, such as the sleeping conditions in the various homes, might not be universally common, but suggest the potential for subclasses.

   d.      *Adequacy*

   The adequacy requirement ensures "that the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This involves two issues. First, the interests of the representatives must not conflict with the interests of the class members. *Van Meter,* 272 F.R.D. at 283.  Second, counsel for the class must be "qualified, experienced, and able to vigorously conduct the proposed litigation."  *Id.* (quoting *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir. 1985)).  Once again, given the similarities among the class members, Plaintiffs have satisfied this requirement.

   e.      *Rule 23(b)*

   Plaintiffs maintain that a class action is appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As previously discussed, the legal issues and the essential factual issues are common to most of the proposed class members.  A class action, therefore, is preferable to multiple trials at which most of the same evidence would be presented. Given that the common issues are central to the resolution of the liability issue as to all of the class members, the common issues "predominate" the individual issues, which, as explained earlier, can be addressed in a meaningful way within the class action.  A class action would also reduce the likelihood of inconsistent results among class members.  Fed. R. Civ. P. 23(b)(1)(A).

CONCLUSION

Based on the foregoing analysis, the recommendation is that the Court (1) grant Plaintiffs'

Motion to File Opt-In Consent Forms (ECF No. 75),[17] (2) deny Defendants' Motion to Decertify

Conditionally Certified Collective Action (ECF No. 81), and (3) grant Plaintiffs' Motion for

Certification of Class Action under Rule 23 (ECF No. 82).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 12ᵗʰ day of December, 2014.

---

[17] Defendants are not prejudiced by the joinder of the individuals identified in Plaintiffs' Motion to File Opt-In Consent Forms. The tardiness of the individuals' filings is not excessive, judicial economy is not negatively impacted, and the remedial purpose of the FLSA is served by permitting the late opt-ins. These factors support granting the motion even in the absence of a showing of good cause for the late submissions. *Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 37 (N.D.N.Y. 2009).